UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

ANNIE WATSON                        :

    Plaintiff,                     :        02 Civ. 2739 (KMW)


      -against-                  :               ORDER


E.S. Sutton, Inc.,                  :

    Defendant.                     :

----------------------------------X


WOOD, U.S.D.J.:


## I.  Overview

On April 30, 2004, after a nine-day trial, a jury determined
that defendant E.S. Sutton, Inc. ("ESS") retaliated against Annie
Watson in violation of Title VII, 42 U.S.C. § 2000e-3(a), New
York state law, N.Y. Exec. Law § 296, and the New York City
Administrative Code, §8-502, et seq.  Specifically, the facts at
trial showed that Watson, previously employed at ESS, was
terminated and otherwise retaliated against after she sent a
letter to a supervisor requesting that he take action against one
of Watson's coworkers who had made sexually explicit comments to

1

Watson.  ESS now moves [i] for a new trial; or in the alternative [ii] for the Court to alter or amend the judgment, or order remittitur, to either reduce or strike the jury award of $ 4,434,000 in punitive, emotional, and compensatory damages.  See Fed. R. Civ. P. 59(a), 59(e), 60(b).[1]  The Court upholds the jury's finding of liability, but orders remittitur as to certain damages.

## II.  Was the jury's verdict against the weight of the evidence?

### A. Standard of Review

ESS urges the Court to order a new trial pursuant to Fed. R. Civ. P. 59(a).  According to ESS, the jury's verdict was infected by evidentiary error and was against the weight of the evidence. Pursuant to 59(a), a new trial "may be granted even if there is substantial evidence supporting the jury's verdict."  DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133-34 (2d Cir.1998). The Court "is free to weigh the evidence [it]self, and need not view it in the light most favorable to the verdict winner."  Id. "That being said, for a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a

_____

[1]ESS styles its motion as one made pursuant to Fed. R. Civ. P. 59(a), 59(e), and 60(b).  ESS's arguments, however, are relevant only to a Rule 59 motion; ESS makes no allegation of mistakes, inadvertence, excusable neglect, newly discovered evidence, fraud, or the like. See Rule 60(b) Therefore the Court analyzes the motion as one under Rule 59, but notes that no grounds for relief under Rule 60(b) are available in any event.

seriously erroneous result or . . . the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." <u>Manley v. Ambase Corp.</u>, 337 F.3d 237, 244-45 (2d Cir. 2003) (internal quotations omitted).

In the Court's view, this case turned on the credibility of Annie Watson as compared to the credibility of her supervisors. That is, was she fired for having complained about an inappropriate sexual comment by the owner's nephew and the boss's cousin, as she alleged?  Or was she fired for failing adequately to perform her duties, as the senior employees of the company contended?  Much of the evidence at trial either was admitted for its relevance to the credibility of the parties, or was circumstantial evidence of their motivations based on their actions.  Having viewed firsthand the testimony and evidence presented at trial, and having carefully reviewed the parties' submissions, the Court is wholly satisfied that the jury's verdict here was not unduly infected by error and moreover was well-supported by the evidence at trial.


**B.  Evidence at Trial**

The Court is "free to weigh the evidence for itself" in deciding a motion for a new trial, <u>DLC Mgmt. Corp.</u>, 163 F.3d at 133-34, and the Court thus bases the following narrative on the witnesses and evidence that the Court found credible.  However,

where necessary to evaluating the weight of the evidence, relevant conflicting testimony that the Court did not find credible is noted. Much of the narrative below is taken from the testimony of Annie Watson-- an eminently credible witness. The Court found her testimony, and her bearing and demeanor while delivering it, to be straightforward, honest, and wholly believable. In contrast, the other witnesses involved in the disputed incident at ESS--specifically Watson's direct supervisor, executive vice-president Albert Sutton; another superior, Yvette Sutton; and Watson's accused harasser, Gaby Sutton[2]--gave testimony regarding material facts that was inconsistent, deliberately vague and not particularly believable. Moreover, the demeanor of each of these witnesses tended to be both unduly defensive and evasive.

Prior to her termination by ESS, Annie Watson had a long, successful career in the fashion industry. Beginning in 1979, Watson attended the Pratt Institute, where she received several awards and honors. Because she received an appealing job offer, Watson left Pratt in 1981. Over the next twenty years or so, Watson worked for various companies, all in the fashion industry. During that time, she moved from the design end of the industry into selling and merchandising. She changed jobs and companies

---

[2]Gaby Sutton is Albert Sutton's cousin, and Gaby's uncle owns ESS. Yvette Sutton is not related to the other Suttons. Tr. 734.

every couple of years, usually finding her new employment by use
of a headhunter.  By the mid-nineties, she was making
approximately $200,000 a year.   See generally Trial Transcript
("Tr.") 278-288.  Plaintiff's Exhibits in Evidence, Exhibit 1
("Plantiff's Exhibit 1").

Prior to working at ESS, Watson was employed by Mishaan
International ("Mishaan").  Watson testified that while at
Mishaan she was approached by a competitor company.  In order to
keep Watson as an employee, Mishaan gave her a two-year contract
that included a $50,000 raise, money for child care (Watson is a
single mother), and additional benefits.   Tr. 288.  At trial, an
executive from Mishaan (and relative of Albert Sutton) testified
that the contract was offered to Watson only because Mishaan had
lost several employees at once and couldn't afford to lose
another, not because Watson was a particularly good employee.
Tr. 817-18 (reasons for contract); 821 (relationship between
Mishaan executive and Albert Sutton).

In 1999, a headhunter put Watson in touch with ESS.  ESS was
in the business of selling sportswear to various retailers such
as Walmart and Dress Barn.  Watson interviewed with the
executive-vice president of ESS, Albert Sutton.  Tr. 290.  Sutton
told Watson that he was looking for someone to handle the J.C.
Penney ("Penney") account.  Previously, ESS had done up to $16
million of business a year with Penney, but lost Penney's

business because ESS had experienced a series of quality and delivery problems. Tr. 291. Albert Sutton hoped to rebuild the relationship with Penney, and hired Watson to accomplish that task. Albert Sutton told Watson he expected it would take a year or more to get back Penney's business. Tr. 298. Watson set to work at ESS to recapture the Penney account. Watson also solicited Sears on behalf of ESS because she had personal contacts there, and she took charge of the company's dealings with Kmart. Despite Watson's efforts, both Sears and Kmart refused to do business with ESS because of prior problems. Tr. 294.

Watson also began putting together a book of trend reports to use as a sales device. According to Watson, "everyone wanted them" to use in attempting to bring in business. Tr. 302. At trial, Albert Sutton testified that he was dissatisfied with Watson spending time on the trend reports because it was more of a design function and less of a sales function, 374-75. Yvette Sutton also suggested that the trend reports were a waste of Watson's time, Tr. 756, but admitted that ESS made 75 copies of them for use by their sales force and that she herself had used them. Tr. 774-75.

Watson made substantial progress with the Penney account. Specifically, after a few sales meetings, Penney agreed to a test order--an order of a small number of goods to see how those goods

6

(and the company providing them) would perform.  Penney ordered a small number of poncho sweaters, to be delivered within an accelerated time-frame.   According to Watson, Albert Sutton and Yvette Sutton were initially thrilled.  Tr. 311.  Yvette Sutton and Watson both ran the order by the production side of the company in order to assure that it could be delivered on schedule. Tr. 313.  The order needed to be delivered by air, not by sea--a more expensive method, which required Albert Sutton's approval.  Tr. 313.

After the order was entered, Watson had the impression that everything was proceeding as planned.  But three days before the order was supposed to be delivered, someone in production informed Watson that the order would not be ready for a few more weeks.  Tr. 315-16.  Watson tried to work out an extension with Penney, but Penney nevertheless cancelled the order.  Tr. 316; 459-461.

Albert Sutton and Yvette Sutton tell a different version of the circumstances surrounding the Penney order.  Albert Sutton claimed at trial that Penney had never actually placed an order, Tr. 112, but had merely made an "inquiry", Tr. 114.  However, at his deposition, Albert Sutton stated that Penney had placed an order that was subsequently cancelled.  Tr. 112-13.   Albert Sutton insisted that he never personally saw any order.  Tr. 114.  But evidence was presented that he had been copied on interoffice

communications about the order and had in fact signed a form detailing the order specifications.  Tr. 454-57.  Yvette Sutton testified initially that when Watson came to her with the Penney order, she told Watson it would be impossible.  However, Yvette Sutton thereafter admitted that it was merely "difficult" and that she had in fact sent the order to production in the hopes of getting it done on time.  Tr. 767-68.

Shortly following the events surrounding the Penney order, Watson had a distressing encounter with Gaby Sutton.  Gaby Sutton, as noted above, was the nephew of the owner of ESS, and was Albert Sutton's cousin.  Although ESS contends that inappropriate workplace behavior was taken seriously and addressed, evidence at trial established that Gaby Sutton had a well-established history of egregious behavior around the office.  ESS never dealt with these incidents in accordance with either its own sexual harassment policy or general workplace norms.

Gaby repeatedly made sexual comments to his female coworkers.  As one witness put it, the comments were never about Gaby, they were never come-ons, but they were always specific to the woman he was addressing.  Tr. 616.  ESS attempted throughout trial (and attempts now) to cast the comments as general (albeit inappropriate).  But that characterization is inaccurate.  For example, ESS concedes only that Gaby Sutton made a sexually explicit comment during "a discussion among a whole group of

employees in the lunch room about a masturbation scene in the movie American Pie," but does not acknowledge that what he said was said to, and directed at, one female employee. Reply Memorandum of Law in Further Support of Defendant's Motion Pursuant to Fed. R. Civ. P. 59(a), 59 (e), and 60(b) at 5 ("Defense Reply"). Gaby Sutton asked her, "well, when you had sex with your husband last night, did it feel like that?" Tr. 323 (Watson direct testimony); <u>see also</u> Tr. 190 (Sherri Fishman direct testimony).

The evidence at trial showed that Gaby Sutton's other comments were similarly personalized, although ESS glosses over this aspect of them. For example, what ESS describes as "a comment [by Gaby Sutton] to [a female coworker] about oral sex," Defense Reply at 5, was described at trial as Gaby Sutton repeatedly asking a female coworker after she had gone on dates "if she gave her date blow jobs." Tr. 192, 322-23. Gaby Sutton also commented to a female coworker about the hardness of her nipples, while she was on the phone with her husband. Tr. 710. (For this, Gaby Sutton apparently subsequently apologized to her husband. Tr. 710.) Also, Gaby Sutton told one young man who worked in the office that, for his prom, he should "get a date that you can, you know, go home and fuck and get some pussy with." Tr. 325. <u>See also</u> Tr. 614, 618-19, 625-26.

Albert Sutton, in his trial testimony, denied knowledge of

these incidents specifically and denied knowledge that Gaby Sutton's behavior was inappropriate generally. Tr. 124. However, much of his testimony on this issue was successfully impeached. Tr. 127, 345.

The specific incident giving rise to this lawsuit took place in Watson's office.[3] Gaby came into her office and told Watson that he gets Penthouse magazine, Tr. 329,--a periodical Gaby Sutton acknowledged at trial was one he had delivered to his office at ESS. Tr. 83. According to Watson, Gaby Sutton then told her

> he was reading in a magazine, and that he read about how women pee on men during sex, and he wanted to know what it felt like, and he was wondering if I had ever done that with my boyfriend and what it felt like. And I said no, get out of here. And he said, well, I figure you'd know all about those kind of things, and I said, well, I don't.

Tr. 329. At trial, Gaby Sutton first admitted only to making a comment about women peeing in public, Tr. 87, but later conceded that his comment was "[p]ossibly" about "women peeing on men during sex," Tr. 91.

After Gaby Sutton's comment, Watson stated that she felt "[p]issed, offended." She went on to say that "[i]t was this

---

[3]Gaby Sutton had no professional reason to be in Watson's office. Tr. 330. He worked at the company in a capacity junior to Watson's, but not under her supervision. Gaby described the relationship as "she was a sales girl. . . . And I was a sales man," Tr. 84, though he was approximately fifteen years her junior, Tr. 1003.

very predatorial kind of feeling; he's standing up, I'm sitting down, no one else is in the office." Tr. 330. A coworker who saw her shortly after the incident described her as "visibly upset," "red" and "mortified." Tr. 695. Watson went to report the incident to Albert Sutton, but he wasn't in, so she wrote him a letter instead. Tr. 415. The letter stated:

> Dear Albert,
>
> I would like to say for the record that today Gaby Sutton was in my office talking to me. He said, "I get a lot of magazines. I have a lot of subscriptions. I get Penthouse. I looked at him as if to say go no further. He proceeded to tell me how "they are always talking about women peeing on men during sex." He then asked, "What is that about? Do you know anything about it? Could you explain it to me?" I said "no" and continued to work. He then said, "Oh, I figured you would know all bout that kind of thing." I said, "I don't." He left my office.
>
> I ask that you please discuss this matter with him and review any company policy on inappropriate conduct. I would prefer to keep this matter private and ask that you request that of him. I simply do not want it to happen again.
>
> Thank you for your attention to this matter. I trust that he will not do anything like it again.
>
> Best Regards,
>
> Annie Watson

Plaintiff's Exhibit 3.

After receiving this letter, Albert Sutton apparently spoke to Gaby Sutton. By everyone's accounts, Gaby admitted making some sort of comment. Tr. 87, 91, 412-13, 417. According to Watson, Albert came to her after speaking to Gaby and said that

"he spoke to Gaby and that Gaby admitted everything, and he said
that [ESS] value[d] [Watson's] contribution to the company."  He
then asked if she wanted Gaby Sutton fired.  Tr. 417.  Watson
replied that if that was the only way to put an end to his
behavior then yes.  Tr. 417.

Within a few days, two things happened (although the exact
chronology is unclear).  Albert Sutton informed Watson that "he
was not going to fire Gaby" because "Gaby had rights" and "had a
lawyer."  Tr. 418.  Also, Watson was moved to a new office.  Tr.
372, 573.  Albert Sutton testified that there were two reasons
for moving her office.  First, Watson's office was in a very
central location that Albert Sutton stated all of the employees
passed every day, including Gaby Sutton.  Albert Sutton testified
that he therefore moved Watson to a back office to give her an
office that Gaby Sutton wouldn't pass all the time.  Second,
Albert Sutton stated that Watson was moved to sit with a more
senior person in order to give her the education of sitting with
someone in the company with more experience.  Tr. 372-372.

Contradicting Albert Sutton's testimony, Watson testified
that her new office was right next door to her old one.  Tr. 734.
Also contradicting Albert Sutton was Gaby Sutton's testimony that
he passed Watson's original office only three to ten times a
week. Tr. 86.  Moreover, Watson testified that her original
office mate was someone with whom she "got along really great."

But the new office mate had moved to Arizona, and thus Watson "was sitting in that [new] office alone ninety-percent of the time" and therefore Watson "didn't have an opportunity to learn anything from" her. Tr. 573.

Up to the point of the incident with Gaby Sutton, Watson had never received a negative review of any kind.[4]  Tr. 421. Instead, Watson testified,

> Prior to [my] making the complaint about Albert's cousin, I was treated with respect and enthusiasm.  My questions were answered.  The samples that I requested were put into work.  I received samples, I received I received prices.  It was, it was-it was a great, great thing.  I felt really great about the way things were going.
>
> After I wrote the letter and complained about Albert's cousin, I felt like a leper in that company, completely - people completely turned on me.  Yvette stopped working with me whenever I'd ask her, did you get this, did you get that, I need these samples or I need prices on this; I'm too busy now, she'd say, I'm too busy. I'd say, well Yvette, when am I going to get it? You know, I need, I need answers on all this stuff that I'm following up on for Penney, and she would just say she was too busy for me.  I'd go into Albert and say, Albert I'm not getting my needs met, I need to get my needs, I've got to get these samples, I've got to get the evaluation from Penney done.  He just ignored me.

Tr. 572-72.

Watson testified that, during this period, she felt as though there was "a black cloud hanging over" her.  She became depressed and saw a therapist whom she had seen before following

_____

[4]Even after Watson's firing, Yvette Sutton provided her with a recommendation letter.  Plaintiff's Exhibit 7.

the death of her father.  Tr. 560.  The therapist gave her sample
packs of anti-depressants, which she took for some time.  Tr.
577-78.

Then, less than one month after complaining about Gaby
Sutton, Watson was fired.  See, e.g., Plaintiff's Exhibit 10.

Watson embarked on a thorough job search, sending out
resumes, contacting headhunters and meeting with people in the
industry.  There was exhaustive evidence of this at trial.  Tr.
422-25, 443-45, 528-555; Plaintiff's exhibit 14, 15.  In the
meantime, she sought unemployment benefits.  However, Watson
testified that she had trouble collecting these benefits because
ESS reported to the relevant authority that she had not worked
for ESS.  Tr. 446.  While looking for a job, Watson did some work
as a photographer's assistant to obtain a small amount of income.
Tr. 529.

Watson had never been a professional photographer, but took
pictures informally (such as at office parties) that others held
in high regard.  Tr. 320; 427-28.  Following a friend's
suggestion, she began photographing acquaintances' children for a
fee.  Tr. 428.  She got a positive response.  After over a year
of job searching, Tr. 581, and under the impression that she had
been blackballed in the industry by ESS, Tr. 579, Watson began to
build a business as a photographer.  Tr. 428-30.  She operated
initially out of her basement, but eventually moved into her own

studio.  Tr. 429.  Even in her most profitable year, however, she made $ 47,823--only a small fraction of the salary she earned in the fashion industry.  Tr. 444-45; Plaintiff's Exhibit 13.

Watson brought a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging unlawful discrimination. ESS responded to her complaint by filing various affidavits, including several signed by female employees.  The affidavits were largely false.

Suspecting this, Watson tape recorded several of her own conversations with her former coworkers.  These tapes were not admitted into evidence at trial, but in those tapes the women who signed the affidavits disavowed the affidavits, and stated that they had signed false affidavits out of fear of losing their jobs.  This was consistent with the testimony of ESS's counsel that he had prepared the affidavits without talking to the women. Tr. 252.  A female employee testified at trial that although the affidavit she had signed stated "I have never heard Gaby Sutton make lewd suggestive or otherwise derogatory remarks to myself or to any other employee,"  Tr. 189, that statement was false.  She stated that she had signed the affidavit because she feared for her job.  Tr. 195-96.  Another woman testified similarly.  Tr. 639.  Also, the affidavits stated, falsely, that these two women had been interviewed by the human resources director following Watson's complaint.  Tr. 229.

The EEOC issued a determination on August 28, 2001, that concluded Watson had an actionable complaint, and expressly referenced the tape recorded conversations.  Plaintiff's Exhibit 10.  Only when this determination was issued did ESS learn that Watson had tape-recorded her conversations.  ESS's attorney then sent a letter to the EEOC asking that the determination be reconsidered and accusing Watson of committing a federal crime by tape recording a conversation without the other parties' knowledge.  Plaintiff's Exhibit 8; Tr 260-62.  The attorney who prepared that letter admitted at trial that he had no idea whether it was in fact a crime to do so (it is not).  The EEOC nevertheless issued Watson a right-to-sue letter on the basis of all of the evidence before the agency.  Plaintiff's Exhibit 11.

Throughout this time, ESS had an official sexual harassment policy ("the Policy").  The Policy stated that

> Harassment includes a wide range of overt and subtle behaviors, which may include, but is not necessarily limited to: Slurs, jokes, [or] other verbal. . . conduct relating to an individual's. . . sex, sexual orientation, [or] marital status. . . . [Y]ou should think before you speak or write.  Slurs and certain jokes or attempts at humor are inappropriate and might be actionable.

Plaintiff's Exhibit 2.  The Policy also states that employees who were subjected to inappropriate behavior of the kind outlined above were "urged, encouraged and expected" to "promptly" discuss the matter with a supervisor; that the harassment committee will then look into the matter; and that the company will maintain a

16

written record of all harassment complaints.  Id.  However, none of these steps were taken, in response either to Watson's complaint or to any other objectionable behavior by Gaby Sutton. Tr. 133-34, 156, 214, 225, 228, 619.

ESS urges repeatedly that the reason the policy was not followed in Watson's case was that Watson had asked that the matter be kept private, see, e.g. Defense Reply at 11; this is unpersuasive, because the Policy itself provides for confidentiality.  ESS argues that the other women subject to Gaby Sutton's behavior either did not officially complain or did not complain at all.  Defense Reply at 5.  Given that the (nominal) company policy regarding sexual harassment was never followed, and given the experience of Annie Watson, such a reluctance to complain is hardly surprising--indeed that reluctance is exactly the ill that retaliation claims under Title VII are supposed to cure.  See generally, Robinson v. Shell Oil Co., 519 U.S. 337, 345-46 (1997); Deravin v. Kerik, 335 F.3d 195, 204-05 (2d Cir. 2003).

### C.  Analysis

#### 1.  Did Watson prove retaliation?

ESS challenges the jury's finding primarily on the grounds that Watson failed to present a viable Title VII retaliation claim.  Pursuant to Title VII, "[i]t shall be an unlawful

employment practice for an employer to discriminate against any
of his employees . . . because [that employee] has opposed any
practice made an unlawful practice by this subchapter . . . ." 42
U.S.C. § 2000e-3(a).  A Title VII retaliation claims is evaluated
pursuant to a three-step burden shifting analysis. See, e.g.,
Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1177 (2d Cir.1996);
Tomka, 66 F.3d at 1308-1309 ([i] plaintiff must present prima
facie case of retaliation; [ii] defendant then has the burden of
articulating legitimate, non-retaliatory reason for the
complained of action; [iii] if defendant meets its burden,
plaintiff must adduce evidence "sufficient to raise a fact issue
as to whether [the employer]'s reason was merely a pretext" for
retaliation). ESS argues in essence that Watson has failed to
meet the first requirement--presenting a prima facie case.  See
Tomka, 66 F.3d at 1308.  In order to establish a prima facie
case, Watson must show "[i] participation in a protected activity
known to the defendant; [ii] an employment action disadvantaging
the plaintiff; and [iii] a causal connection between the
protected activity and the adverse employment action." Id. at
1308.


### a.  Was Watson engaged in "protected activity"?

ESS argues primarily that Watson's case fails as a matter of
law because her complaint was not a "protected activity."  In

this Circuit, for a sexual harassment complaint to have been a "protected activity" under Title VII, the behavior complained of need not itself violate Title VII.  Quinn v. Greentree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998).  Instead, a complaint of sexual harassment is a protected activity so long as the plaintiff can:

> demonstrate that she had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.  Thus, it is possible for an employee to reasonably believe that specified conduct amounts to harassment, even when that conduct would not actually qualify as harassment under the law.

Id., at 769 (emphasis added)(internal citations and quotation marks omitted); see also Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996); Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir.1988).  ESS contends that Watson herself did not actually believe that Gaby Sutton's one offending statement constituted harassment, and that no reasonable person could have believed that it did.

The jury was instructed to determine, "whether [Watson] engaged in a protected activity in complaining about Gaby Sutton's conduct," that is, "whether her complaint was based on a good faith, reasonable belief that she had been sexually harassed in violation of the law."  Court's Exhibits, Exhibit 8 at 18.  ESS argues that the jury's affirmative response to this question cannot be upheld.  Memorandum of Law in Support of Defendant's Motion Pursuant to Fed. R. Civ. P. 59(a), 59(e) and 60(b)

(hereinafter "Defense Brief") at 7.  However, the jury was properly charged.

ESS also contends in its briefs that the jury was not provided with adequate clarification when it questioned the court as to the definition of protected activity.  But this Court's response to the jury's inquiry was perfectly appropriate under the law.  The Court's response to the jury stated, in part:

> [T]he activity that Ms. Watson claims was protected by law was her written complaint to Albert Sutton regarding Gaby Sutton's conduct.  That complaint can be a "protected activity" under the law if Ms. Watson had a good faith, reasonable belief that Gaby Sutton's conduct was unlawful.  You need <u>not</u> find that Gaby Sutton's conduct was, in <u>fact</u>, unlawful.

Court's Exhibit 10 (emphasis in original).  The Court also instructed the jury that if the above did not adequately respond to the inquiry, the jury should "please write another note."  Id. ESS now objects (although it did not at trial, Tr. 1051-54) that the instruction did not explain "that there was some minimum threshold that the conduct must be meet [sic] before a belief would be considered reasonable."  Defense Memo at 9.  Of course, the word "reasonable" itself sets that threshold.

Because the jury was properly instructed on the law, in order to prevail on the instant motion, ESS must establish that the evidence at trial did not support the conclusion that Watson's complaint about Gaby Sutton's comment was protected activity.  ESS argues that it was unreasonable for Watson to

believe that the one offensive comment by Sutton was harassment.
"[T]he reasonableness of plaintiff's belief is assessed in light
of the totality of the circumstances," and plaintiff's belief
must be both "subjectively genuine" and "objectively reasonable."
Spadola v. N.Y. City Transit Auth., 242 F. Supp. 2d 284, 291
(S.D.N.Y. 2003).

### i) Subjective Belief

ESS argues first that Watson herself did not subjectively
believe that she was harassed.  Based on the evidence adduced at
trial, ESS's position is untenable, was rejected by the jury, and
is now rejected by this Court.

ESS argues that if Watson really had felt harassed she would
have used stronger language, or would have made a formal sexual
harassment complaint.  This is ludicrous.  A woman who believes
that she has been subjected to sexual harassment might (quite
sensibly) informally report the offensive conduct to a more
senior employee.

ESS argues that because "unlawful sexual harassment" is by
its nature "unwanted, threatening, or humiliating," citing
Spadola, 242 F. Supp. at 91, Watson's response to the incident
should have been somehow different.  Defense Brief at 8.
Watson's letter to her employer requested that management "please
discuss [Sutton's conduct] with him and review any company policy
on inappropriate conduct."  She noted that she "would prefer to

21

keep this matter private and. . . ask[ed] that [management] request that of [Sutton]."  She concluded by stating, "I simply do not want it to happen again."

The Court disagrees with ESS's contention that Watson's letter suggests that she did not have a subjective belief that she had been harassed.  Defense Brief at 8.  Watson's letter clearly indicates that Sutton's comment was "unwanted" ("I simply do not want it to happen again."), and suggests that she may have found it humiliating ("I would prefer to keep this matter private and ask that you request that of him.").  Frankly, from Gaby Sutton's statement alone–that he thought that Watson "would know all about" "women peeing on men during sex"--the jury could have inferred subjective humiliation.  And Watson stated in her trial testimony (which this Court found credible) that when Gaby Sutton was making the statement to her, she experienced a "very predatorial kind of feeling; he's standing up, I'm sitting down, no one else is in the office, and he's talking to me about something." Tr. 330.  From this statement, the jury could have concluded that Watson felt threatened by Sutton.

ESS also argues that Watson's trial testimony, in which Watson stated that she was "pissed" and "offended," "belies" a subjective belief that she had been harassed.  Defendant's memo 8-9.  First, ESS neglects to mention additional testimony by Watson that she was "extremely upset."  Tr. 415.  Second, ESS

does not explain in what way her response "belie[d]" her belief that she had been sexually harassed.   Certainly a woman of Watson's professional stature, when confronted with Sutton's statement, might feel not only humiliated and threatened (which defense counsel suggests is the appropriate response for a harassed woman), but also angry and offended to be spoken to in such a way in her place of work.

ESS's argument that Watson lacked a subjective belief that the complained of conduct was sexual harassment in violation of the law is wholly without merit.

## ii) Reasonable belief

ESS also contends that Watson's belief that Gaby Sutton had violated the law was not "objectively reasonable."  In support of this assertion, ESS cites to Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268 (2001).  The female plaintiff in Clark County worked reviewing psychiatric evaluations of potential employees.  One of the evaluations noted that an applicant had once said to a coworker "I hear that making love to you is like making love to the Grand Canyon."  Id.  at 269.  The plaintiff's male supervisor read the comment aloud in front of plaintiff and stated that he did not know what it meant.  Id.  A male coworker then responded "I'll tell you later," and the two men chuckled.  Id.  The district court granted summary judgment to the defendant

employer.  The Ninth Circuit reversed.  The Supreme Court reinstated the district court judgment, holding that "No reasonable person could have believed that the single incident recounted above violated Title VII's standard." Id. at 271.

Clark County is distinguishable on its facts.  The Court in Clark County focused on the fact that considering applicant psychiatric evaluations was part of the plaintiff's job.  "The ordinary terms and conditions of respondent's job required her to review the sexually explicit statement in the course of screening job applicants. Her co-workers who participated in the hiring process were subject to the same requirement, and indeed, in the District Court respondent conceded that it did not bother or upset her to read the statement in the file."  Clark County, 532 U.S. at 271 (internal quotation marks omitted).  The purported harassment therefore had to be her supervisor's comment that he didn't understand the sexually explicit remark in the application and her coworker's response that he would explain it later, and the two men's resultant chuckling.  The exchange between the two men was far less offensive than the statement made by Gaby Sutton and the statement by the job applicant was not directed at the plaintiff.

The Court observes that here, unlike Clark County, a jury unanimously held that the plaintiff reasonably believed that she had engaged in protected activity.  The evidence at trial

supported the conclusion that Watson's belief was objectively reasonable. First, the ESS policy states that inappropriate comments like the kind made by Gaby Sutton can be actionable harassment. Plaintiff's Exhibit 3 ("Slurs and certain jokes or attempts at humor" "relating to . . .sex" "are inappropriate and might be actionable."). Second, Albert Sutton himself admitted that he would view the statement alleged in Watson's letter as harassment, had it occurred as she stated. Tr. 168. Finally, ESS's human resources director admitted that the statement would at least merit an investigation as to whether harassment had occurred. Tr. 232. Because the jury was properly charged, and the evidence supported the jury's conclusion, any contention that the jury's verdict was untenable based on the evidence fails.[5]

The Court also notes that ESS doesn't seem to be challenging the evidence at trial that supports the finding of fact that the belief was reasonable. Rather, ESS seems to be arguing that Watson's complaint could not be "protected activity" as a matter of law.

ESS is in an awkward position to argue the legal definition of protected activity: at trial ESS opposed as "preposterous" Watson's arguments to the Court that the definition of

---

[5]ESS also cites as support <u>Holmes v. Long Island R.R.</u>, 2001 U.S. Dist. Lexis 10431, at * 19 (E.D.N.Y. June 4, 2001) and <u>Spadola v. N.Y. City Transit Authority</u>, 242 F. Supp. 2d 284, 291 (S.D.N.Y. 2003). These decisions, too, are summary judgments.

"reasonable" should be a legal question.  Tr. 1050-51.  The Court notes that ESS never made a motion to dismiss this case (on the grounds that Watson had failed to state a claim for which relief could be granted), or motion for summary judgment (on the grounds that the activity she was alleging was protected under Title VII could not be protected as a matter of law).  In fact, to the Court's recollection (and based on a thorough review of the record), this is the first time ESS has ever brought <u>Clark County</u> to the Court's attention.   The Court concludes that ESS waived the defense that Watson's letter cannot be protected activity under <u>Clark County</u>.

Even now, ESS has filed a motion seeking a new trial--not a motion for a judgment as a matter of law.  The former is meant to deal with inadequacies at trial or errors in the jury's evaluation of the evidence.  The latter is for errors of law or incontestable errors in the jury's evaluation of the evidence. What remedy is a new trial if, as ESS contends, <u>Clark County</u> requires that "no juror could reasonably believe that [Watson's complaint] violated Title VII"?  Defense Reply at 7.  If ESS were right, the Court should grant ESS judgment as a matter of law.[6]

_____

[6]A new trial, by contrast, would merely be an experiment to determine the validity of ESS's contention that no jury could reasonably believe Watson's activity was protected (or more precisely, an experiment to see if such a thing could happen twice; or whether the Southern District could impanel two unreasonable juries in a row).

For the above reasons, the argument that the jury verdict
that Watson did not engage in protected activity cannot be upheld
must fail.

### b. Did the jury understand the adverse employment action at issue?

Having thus established that she engaged in protected
activity, Watson bore the burden of showing that ESS took an
employment action that disadvantaged her.  Richardson v. New York
State Dep't of Correctional Serv., 180 F.3d 426, 446 (2d
Cir.1999).  ESS conceded at trial that Watson's termination was
an adverse employment action.  Court's Exhibit 8 at 17.  However,
ESS argues that the jury was mislead as to whether other actions
by ESS against Watson could qualify as adverse or retaliatory
such that she should recover.  This argument fails.

As ESS concedes, the only adverse employment action
identified in the jury charge was the termination.  Defense Reply
at 9.  Specifically, the jury was instructed that it should
determine whether ESS "took an adverse employment action against
[Watson]" and whether Watson's "protected activity was a
motivating factor in the Company's decision to take an adverse
employment action against her."  The instruction then further
specified that "Defendant concedes that the termination of
plaintiff constituted an adverse employment action" and
instructed that the issue before the jury was whether  "Ms.

Watson [could] establish that her complaint was a motivating factor in the Company's decision to terminate her." Court's Exhibit 8 at 17. The instruction then elucidated the appropriate role of the evidence presented at trial:

> In deciding this issue, you may consider all actions taken or not taken, all statements made, and all other facts and circumstances received in evidence, including, but not limited to, the proximity in time between the complaint and the termination. If Ms. Watson has failed to establish , by a preponderance of the evidence, that her protected activity was a motivating factor <u>for the Company's decision to terminate her, you should find against Ms. Watson and in favor of the Company.</u>

Court's Exhibit 8 at 17-18 (emphasis added). The jury was thus well aware that the adverse employment action was the termination, and that the issue before the jury was whether that termination was retaliatory. The instruction also made clear that the other "facts and circumstances received in evidence" were to be considered only in connection with determining whether Waton's "complaint was a motivating factor" in ESS's decision to terminate her.

ESS argues that the jury improperly considered the evidence at trial of ESS's mistreatment of Watson other than her termination to also constitute <u>actionable</u> retaliation. ESS bases this on statements by Watson's counsel describing essentially every action by ESS as "retaliatory." Indeed, Watson's counsel used the word rather liberally in both his opening and closing

statements, and ESS may be correct that several of the actions characterized as retaliatory by Watson's counsel are not actionable under Title VII. (ESS did fail, however, to object to these statements at trial.) Regardless, the Court is satisfied that the jury charge adequately clarified both that the termination was the adverse employment action at issue, and that the other actions of ESS were relevant only for the purpose of determining ESS's motivation in terminating Watson. See DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1986) (motivation of adverse employment action "can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment. . . or directly through evidence of retaliatory animus directed against a plaintiff by the defendant").

The Court expressly instructed that unless Watson established that "her protected activity was a motivating factor for the Company's decision to terminate her, you should find against Ms. Watson and in favor of the Company." Any error in Watson's counsel's statements was thus cured, and ESS suffered no prejudice requiring a new trial. See Tesser v. Bd. of Educ., 370 F.3d 314, 321-22 (2d Cir. 2004); Greenbaum v. Handelsbanken, 67 F. Supp. 2d 228, 273 (S.D.N.Y. 1999) ("Although the Court agrees that [plaintiff's] counsel behaved in a manner that was far less than professional on many occasions during the trial, and

although the Court agrees that many errors were committed, these errors do not warrant a new trial in this case. Curative instructions are ordinarily sufficient to render counsel errors harmless.").

   **c. Was the jury verdict against the weight of the evidence insofar as the jury found that there was a causal connection between the protected activity and the adverse employment action?**

The final element of a Title VII claim is proof that the adverse employment action was motivated by the protected activity.  The evidence in this case supported the jury's conclusion that Watson's firing was motivated at least in part by her complaint to Albert Sutton about Gaby Sutton's comment.  In its motion for a new trial, ESS makes essentially the same arguments it made at trial.  The jury found those arguments unpersuasive, and the Court does as well.

A causal connection can be established by direct or indirect evidence of a retaliatory motive.  Here, the indirect evidence was very strong.  First, a plaintiff can indirectly establish the necessary causal connection by "showing that the protected activity was closely followed in time by the adverse [employment] action." Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir.1996).  The Second Circuit has held that when a plaintiff is terminated less than two months after filing a sexual harassment complaint with management, and ten days after filing a complaint

with the state human rights office, those short time periods are prima facie evidence of a causal connection between the protected activity and the retaliation.  Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir.1998); see also Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001) (summarizing decisions).

As soon as she made her complaint, Watson was treated differently.  She stopped receiving any sort of professional support; she was immediately moved out of an office she shared with a friend into an essentially vacant one; and she was fired one month later.  These facts alone support a finding of retaliation.

ESS tried to rebut the obvious implication of the above time-line by arguing that Watson was fired for mishandling the Penney account, and by arguing that ESS took sexual harassment seriously.  ESS argues that a meeting with Penney from which Watson returned empty handed was an intervening event, breaking the causal chain between the complaint and the termination. Defense Brief at 17; See Das v. Our Lady of Mercy Med. Ctr., 2002 U.S. Dist. LEXIS 7771, at * 36-37.  The jury clearly discredited ESS's account of the circumstances surrounding the Penney account, and this Court, too, found Watson's version of events more credible.

Also, contrary to ESS's assertion, the evidence did not

support the conclusion that ESS "took [Watson's] complaint seriously." Defense Brief at 15. The company did not take the action required of it by its own policy. Regardless of the relief Watson requested, the failure to at least keep the required records of her complaint suggests that ESS did not take it seriously. Indeed, ESS not only failed to address Watson's complaint in a meaningful way at the time, it also engaged in serious malfeasance before the EEOC in an attempt to cover up Gaby Sutton's wrongdoing. (ESS calls the submission of demonstrably false affidavits "trial strategy"--a characterization almost as offensive as the underlying act itself. Defense Reply 16.) This malfeasance at the very least undercuts ESS's credibility generally.

Similarly, the numerous other incidents of inappropriate behavior by Gaby Sutton that were testified to at trial supported an inference that the company did not take sexual harassment seriously. ESS argues that the fact that no other women were fired for making any comment or complaint about Gaby Sutton's behavior "disproves" Watson's allegation that she was fired for doing so. Defense Brief at 16. This is unavailing. The evidence at trial proved that ESS did not take inappropriate sexual behavior seriously, and that the women in the company were generally afraid (with good cause) to speak up or complain-- indeed they were willing to lie to the EEOC and claim that

certain offensive incidents had never occurred, in order to
protect their jobs.

ESS argues that ESS was not required by law to take any
action on Watson's complaint other than what it did.  See
Distasio v. Perkin Elmer Corp., 157 F.3d 55, 65 (2d Cir. 1998)
(describing what sort of inaction by employer can lead to Title
VII liability).  This is irrelevant.  The liability imposed on
ESS was not based on its inaction; it was based on a retaliatory
discharge.  The two types of claims are distinct.  ESS's inaction
was not the grounds for Watson's claim, but because it undermines
the credibility of those persons at the company who claimed that
sexual harassment was not tolerated it supports Watson's claim
that she was discharged in retaliation.

The evidence at trial amply supported the jury's finding
that Watson's "complaint about Gaby Sutton's conduct . . . was a
motivating factor for the decision by [ESS] to terminate her."
Jury Verdict at ¶ 1.  The Court notes that the attorneys for both
sides seem to confuse the issue of what ESS behavior was
actionable retaliation, and what behavior was merely evidence of
ESS's motive and credibility (plaintiff argues that certain
actions other than termination constituted retaliation,
Plaintiff's Brief at 9-10, and ESS responds to these arguments in
some detail, Defense Reply at 6-9).  In fact, the question of
what other action by ESS might legally be considered an adverse

employment action is irrelevant given the express language of the jury charge and verdict, and the evidence at trial supporting the jury's findings.

### III.  Are the damages sustainable?

The jury awarded Watson $500,000 in emotional damages, $884,000 in back-pay and benefits, $550,000 in front-pay and benefits, and $2.5 million dollars in punitive damages.  ESS seeks a new trial or remittitur, arguing that these damages are excessive.

Remittitur is "the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial."  Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328 (2d Cir.1990) (quoting Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 49 (2d Cir.1984)) (internal quotation marks omitted); see also Lightfoot v. Union Carbide Corp., 110 F.3d 898, 914-15 (2d Cir.1997) (in order to "reduce the damages" court must offer "the prevailing party the option of a new trial" (internal citations omitted)).  The decision as to whether remittitur is required is committed to this Court's discretion. Rangolan v. County of Nassau, 370 F.3d 239, 245 (2d Cir.2004); see also Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 435-38 (1996).

This Court must vacate an award under federal law when it is

so excessive as to "shock the conscience." <u>Scala v. Moore</u>

<u>McCormack Lines, Inc.</u>, 985 F.2d 680, 684 (2d Cir. 1993).  Awards

under New York State law are reviewed for whether they "deviate

materially" from what would be reasonable compensation.  <u>See</u> N.Y.

C.P.L.R. § 5501(c).  Because the punitive and emotional distress

damages awarded exceed the statutory cap for the federal claims,

these will be treated as though awarded under state law.[7]  <u>See</u> 42

U.S.C.A. § 1981a(b)(3)(d) (statutory cap for federal claims);

<u>Bick v. City of New York</u>, 1998 U.S. Dist. LEXIS 5543, *64

(stating that in order to give plaintiff full benefit of state

law claims, amounts in excess of federal statutory cap shall be

treated as arising under state law).  The compensatory damages

will be reviewed for whether they "shock the conscience."[8]


### A.  Emotional damages

ESS contends that the award of $500,000 in emotional damages

is excessive.  The Court agrees.  Watson has not pointed us to

_____

[7]Although punitive damages are not available under New York
state law, they are available without limitation under the New
York City Administrative Code §8-502, <u>et seq.</u>  ESS therefore does
not contend that the punitive damages are subject to the federal
statutory cap.  Defense Brief 19, 29.

[8]ESS does not claim that front pay should be evaluated under
the state standard, Defense Brief at 19; however, front-pay is
covered by the federal statutory cap, and the amount awarded does
exceed that amount, so presumably the state standard would apply.
<u>See</u> 42 U.S.C.A. § 1981a(b)(3)(d).  However, because the Court
would uphold that award under either standard, ESS's error is
irrelevant.

any comparable cases--that is, cases with no permanent psychological damage or disability resulting from the harassment--with awards so high as the one the jury here gave her.  The decisions she has cited approving multi-hundred-thousand dollar awards for emotional damages all involve post-traumatic stress disorder, and plaintiffs who were forced to be medicated and out of work for extended periods of time.  See O'Rourke v. City of Providence, 235 F.3d 713, 733-34 (1st Cir. 2001); Gotthardt v. Amtrak, 191 F.3d 1148, 1156 (9th Cir. 1999); Baty v. Willamette Indus., 172 F.3d 1232, 1244 (10th Cir. 1999);  Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1075 (10th Cir. 1998); Ramirez v. New York City Off-Track Betting Corp., 112 F.3d 38, 41 (2d Cir. 1997).  Watson has failed to demonstrate that $500,000 is a reasonable verdict in light of comparable cases.

However, ESS's contention that "garden variety" emotional damage awards are in the range of $5000 to $30,000 is also not persuasive, because those numbers appear to be at the low end of the range of damages generally awarded under New York law.  "New York cases vary widely in the amount of damages awarded for mental anguish."  Cross v. New York City Transit Authority, 417 F.3d 241, 259 (2d Cir. August 2, 2005) (quoting Meacham v. Knolls Atomic Power Lab., 381 F.3d 56, 78 (2d Cir. 2004) certiorari granted on other grounds and judgment vacated by KAPL, Inc. v. Meacham, 125 S.Ct. 1731 (Apr. 4, 2005)); see also Cross, 417 F.3d

at 259 n.4 (reaffirming validity of <u>Meacham</u> remittitur holding).
So although ESS is correct that many decisions "reduce awards to
$30,000 or below," <u>id.</u> (citing collection of decisions), others
"uphold awards of more than $100,000 without discussion of
protracted suffering, truly egregious conduct, or medical
treatment," <u>id.</u> (citing collection of decisions).  The Second
Circuit in <u>Meacham</u> rejected a defendant's challenge to an order
remitting an award for emotional damages to $125,000 in a case in
which plaintiffs "had not offered evidence of treatment or
physical sequelae," because that award did not "deviate
substantially from verdicts awarded under similar circumstances."
<u>Cross</u>, 417 F.3d at 259 (relying on <u>Meachum</u> to uphold jury award
of $50,000).[9]

The Court is confident that $500,000 is well outside the
acceptable range of damages under the law.  The range of
acceptable damages for emotional distress in adverse employment
action cases lacking extraordinary circumstances seems to be from
around $30,000 to $125,000.  As Watson's jury award for emotional
distress deviates materially from that range, it cannot stand.
Because the jury, and this Court, found that Watson suffered
considerable distress, the Court is inclined to remit the award

_____

[9]<u>Meacham</u> and <u>Cross</u> were age discrimination cases; however,
the cases upon which they rely and the jury verdicts summarized
spanned harassment and discrimination actions of all types.
See <u>Meacham</u>, 381 F.3d at 78.

to $120,000, a value within the appropriate range that nevertheless reflects the jury's view that Watson's distress was considerable.

### B.  Back-pay, front-pay and benefits

"A discharged employee must 'use reasonable diligence in finding other suitable employment,' which need not be comparable to their previous positions." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 54 (2d Cir. 1998) quoting Ford Motor Co. v. EEOC, 458 U.S. 219, 231 & n.15 (1982).  Here, the evidence at trial plainly demonstrated that Watson embarked on a lengthy and thorough search for employment in the fashion industry.  After an utter lack of success, and believing that she had been blackballed in the industry, she followed the suggestion of a friend and began to do photography work.  Experiencing some success, she decided it was in her best financial interests to pursue photography as an alternative career.  Self-employment is an acceptable form of mitigation, Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 696 (2d Cir. 1998), and the Court sees no reason to hold otherwise just because a plaintiff has switched industries, especially where, as here, such a decision was reasonable under the circumstances.  Also, given the evidence at trial, it is clear that regardless of Watson's efforts to mitigate, the jury award took into account her limited prospects

of finding employment comparable to her job at ESS.  Dominic v.
Consolidated Edison Co., 652 F. Supp. 815, 819-20 (S.D.N.Y. 1986)
aff'd  822 F.2d 1249 (2d Cir. 1987).

ESS attempts to re-characterize the evidence at trial,
arguing that Watson wanted out of the fashion industry and made a
deliberate choice to pursue a new (lower paying) career in
photography.  Had Watson deliberately foregone more gainful
employment, she would not be entitled to full mitigation; the
purpose of back and front pay is to restore a plaintiff to her
status quo, not to provide a windfall.  Kirsch v. Fleet St.,
Ltd., 148 F. 3d 149, 166-69 (2d Cir. 1998).  However, the Court
finds that Watson did not deliberately forego a higher paying
career--and obviously the jury agreed, awarding Watson damages to
cover the difference between her expected photography income and
what she would have made had she continued at ESS.

ESS also argues that the jury award of back and front pay
were speculative under the Second Circuit's decision in Bracey v.
Bd. of Educ., 368 F.3d 108 (2d Cir. 2004).  ESS is incorrect.
The evidence at trial was extensive--consisting of (thoroughly
cross-examined) expert testimony and a detailed expert report
based on Watson's financial records and the use of various
projection and actuarial tools accepted and relied upon in
economics. Tr. 878-939.  Bracey is wholly inapposite.  In that
case, there was no testimony as to loss, no economic analysis, no

reports, and no explanation for the damages given.  The jury

arrived at a seemingly random figure of $250,000 and the only

evidence of damage in the record were the plaintiff's tax

returns.  Contrary to ESS's characterization of Bracey, in that

case the Court concluded not that the damages awarded were too

great, but "only that [plaintiff] has failed to prove them in

this case."  Bracey, 368 F.3d at 119.  Here, the back and front

pay awarded by the jury was well-supported by the evidence at

trial.

### C. Punitive Damages

Punitive damages serve a different function than

compensatory damages.  State Farm Mut. Auto Ins. Co. v. Campbell,

538 U.S. 408, 416 (2003).  Punitive damages "are aimed at

deterrence and retribution."  Id.; see also BMW of N. America

v.Gore, 517 U.S. 559, 568 (1996).  "The Due Process Clause of the

Fourteenth Amendment prohibits the imposition of grossly

excessive or arbitrary punishments."  In reviewing punitive

damages, this Court must "consider three guideposts: (1) the

degree of reprehensibility of the defendant's misconduct; (2) the

disparity between the actual or potential harm suffered by the

plaintiff and the punitive damages award; and (3) the difference

between the punitive damages awarded by the jury and the civil

penalties authorized or imposed in comparable cases."  Id. at 418,

citing <u>BMW</u>, 517 U.S at 575.

### 1) Reprehensibility

Courts "determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; . . . the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." <u>State Farm</u>, 538 U.S. at 419. There can be no dispute that ESS's misconduct was reprehensible. The evidence at trial showed a systemic failure to take seriously women's complaints of sexual misconduct, and malicious termination of Watson because she complained.

Watson, a single mother, was terminated for speaking up about Gaby Sutton's behavior, and as a result was left with no income; she had to scramble to support herself and her child. ESS responded to Watson's accusations by firing her, then filing indisputably dishonest affidavits, and finally accusing Watson (falsely) of having committed a federal crime.[10] Punitive damages may be based not only on the actionable behavior, but on related misconduct, so long as it is closely relevant to the harm borne by the plaintiff. <u>Cf. id.</u>, 538 U.S. at 424 (vacating punitive damages "because the [plaintiffs] have shown no conduct

---

[10]Bad faith actions such as these are assuredly not protected "trial strategy." <u>See</u> <u>Weissman v. Dawn Joy Fashions</u>, 214 F.3d 224, 236 (2d Cir. 2000).

by [defendant] similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis" and noting that "[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business").  From ESS's actions, the jury appropriately found malice and deceit.  Weissman v. Dawn Joy Fashions, 214 F.3d 224, 236 (2d Cir. 2000) (observing that actions surrounding termination were relevant to finding of "requisite evil motive"); see also Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 538 (1999) (stating that evidence of defendant's state of mind, rather than nature of challenged conduct, establishes propriety of punitive damages).  Although only the termination was challenged under Title VII, the surrounding behavior of ESS (such as ostracizing Watson at work, and attempting in bad faith to discredit her before the EEOC) indicates a particularly malicious motivation for the termination.

ESS argues, Defense Brief at32-33, that the evidence at trial did not support the required "positive element of conscious wrongdoing."  See Kolstad, 527 U.S. at 538.  However, as noted above, the testimony surrounding the preparation of the false affidavits and the letter accusing Watson of a federal crime was certainly adequate to permit the inference of conscious wrongdoing by various ESS actors.  Moreover, trial testimony made

clear that Albert Sutton was aware of the company harassment policy and deliberately disregarded it. Based on his other behavior the jury could have chosen not to credit testimony that Albert Sutton's reason for disregarding policy was because Watson wanted to keep her complaint private (particularly as the policy itself highlights the importance of privacy).[11] The evidence supporting "conscious wrongdoing" was ample.[12]

### 2) Proportionality

The ratio of the punitive damages to the compensatory damages here strains the bounds of due process. Although the Supreme Court has declined to set a bright-line rule as to what ratio is acceptable, the Supreme Court has stated that "[w]hen compensatory damages are substantial, then a lesser ratio [of compensatory damages to punitive damages], perhaps only equal to

---

[11]Again, ESS misses the point of this evidence. Defense Reply 14. That Albert Sutton failed to follow company policy does not in and of itself give rise to a liability, see Karibian v. Columbia Univ., 930 F.Supp. 134, 136 (S.D.N.Y. 1996), but that he deliberately disregarded the policy suggests that terminating Watson was done with full knowledge and deliberate disregard of her legal rights.

[12]Contrary to ESS's assertion, Defense Brief 32-33, the jury was appropriately charged that it needed to find that the discriminatory act against the plaintiff was "wanton, reckless, or malicious." Court's Exhibit 8 at 28. The jury was specifically told that ESS's act had to be "done deliberately, with knowledge of plaintiff's rights, and with the intent to interfere with those rights." Id. The Court's charge adequately stated the relevant law. See Weissman, 214 F.3d at 235 (rejecting punitive damages where defendant had failed to act with reckless indifference or malice towards plaintiff's rights under the discrimination laws).

compensatory damages, can reach the outermost limit of the due process guarantee." State Farm, 538 U.S. at 425. The Supreme Court has recognized that a punitive damages award of $1,000,000 (less than Watson's total compensatory damages here) is "substantial." Id. Due process requires the reduction of the punitive damages in this case, to bring them more into proportion with the compensatory relief granted.

### 3) Comparable Cases

Finally, the Court must also consider penalties in comparable cases. Watson fails to point the Court to any cases with comparable punitive damages (however, the Court acknowledges that there are very few truly comparable cases). Under federal law, punitive damages are limited to S300,000; under New York state law they are not available. See Funk v. F&K Supply Inc., 43 F. Supp. 2d 205, 25-26 (N.D.N.Y. 1999); accord Gonzalez v. Bratton, 147 F. Supp. 2d 180, 204 (S.D.N.Y. 2001). Thus, a plaintiff in Watson's shoes in this state can recover punitive damages in excess of $300,000 only under the New York City Administrative Code, §8-502(a). Although jury verdicts in excess of $300,000 occur in New York, See John Caher, Jury Awards $15 Million in Sex Harassment Case, New York Law Journal, May 10, 2004 at A1, only in very few cases can such verdicts can be affirmed (those brought under the New York City code). Ergo, most "comparable cases" (that is, New York State and Title VII

discrimination claims) have allowed punitive damages of only $300,000 or less.  See, e.g. Luciano, 110 F.3d at 222 (finding $300,000 punitive award against wealthy employer "modest" and affirming such award).  And cases with large jury awards, like this one, are generally reduced to the maximum allowed under the statute.  See id.

Many of the cases cited by ESS are not truly comparable, as they arise under a different statute.  Also, many of the cases cited by ESS involve defendants with far less wealth than ESS. See generally Defense Brief at 30.  In those cases, smaller punitive damages provide adequate deterrence where here such damages would not.[13]  See Tr. 400-01.

Having considered all of the foregoing, including previous awards under New York State and federal law, the unlimited punitive damages available under New York City law, the constitutionally permissible ratio of compensatory to punitive damages, the relative wealth of ESS, and the need to deter similar conduct, the Court concludes that $717,000 in punitive damages is appropriate (approximately 50% of the compensatory damages awarded).  This is less than the maximum that would be

---

[13]Any assertion that the jury improperly considered ESS's relative wealth is without merit, as a defendant's wealth is admissible and relevant to punitive damages.  See Tesser v. Board of Educ. of City School Dist. of City of New York, 370 F.3d 314, 318 (2d Cir. 2004); Luciano, 110 F.3d at 221-22.

constitutionally permissible, but the Court does not believe that this is a case with the most culpable conduct possible. This award is within range of the awards given in comparable cases brought under only federal and state law, but still reflects the additional damages available under the City code. Additionally, the amount is substantial enough to deter, while not being unduly burdensome. See McIntyre v. Manhattan Ford Lincoln Mercury, 256 A.D.2d 269, 270-71 (N.Y. 1988) (upholding $1.5 million dollar punitive award against Ford Motor Company); see also Defense Brief at 13 n.11 (arguing, correctly, that ESS is not as wealthy as Ford). The Court, in its discretion, believes this award is within the appropriate range, reflects the seriousness of the malfeasance, and will adequately deter similar conduct. See Luciano, 110 F.3d at 221.

## IV. Do any evidentiary rulings require a new trial?

ESS objects to the admission or exclusion of various pieces of evidence. The Court is persuaded that if any errors occurred, they were not so substantial, either individually or in sum, as to render the verdict "seriously erroneous" or a "miscarriage of justice" such that a new trial is required. Manley, 337 F.3d at 244-45; Fed. R. Civ. P. 61.

### 1. Watson's testimony that she was told she was blackballed

ESS objected at trial to the admission of hearsay testimony by Watson. Watson testified that she was told by a headhunter that ESS had told other companies in the fashion industry not to hire her--that she was black-balled. This testimony was not admitted for the truth of the matter asserted, but as evidence only of whether plaintiff believed that continuing to search for a job in the fashion industry was likely to be fruitless.

The reason Watson changed careers is relevant to damages. ESS strenuously pushed the theory at trial that Watson had gone into photography because she wanted a change from the fashion industry, whereas Watson contended she began a (lower-paid) career in photography because she was desperate and unable to find work in fashion. Additionally, ESS argued (at length) that Watson failed to mitigate damages. This assertion made Watson's belief that she had been blackballed relevant. If she believed she was blackballed, rather than continue looking for work in the fashion industry, the more sensible approach to mitigation was to begin a new career. Viewing the evidence at trial as a whole, and the issues presented by both sides, the disputed testimony was without a doubt more probative than prejudicial. Fed. R. Evid. 403.

Also, the jury was expressly instructed, multiple times, that Watson's testimony was "received not for the truth of what the headhunter said, but for the fact that Miss Watson is

testifying that she heard it from the headhunter." Tr. 579, 595. Jurors are presumed to follow limiting instructions. United States v. Jones, 16 F.3d 487, 493 (2d Cir.1994). The decisions cited by ESS deal with statements admitted for their truth, and are wholly inapplicable here. See Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999) (statement offered as basis of retaliatory action was hearsay); Farjam v. N.Y. Health and Hosp. Corp., 2000 U.S. Dist. LEXIS 3741, *56 (S.D.N.Y. March 23, 2000) (same); Evans v. Port Auth., 192 F. Supp. 2d 247 (S.D.N.Y. 2002) (hearsay statement offered for its truth was not admissible and was not party admission); Sandman v. Mediamark Research, 2002 U.S. Dist. LEXIS 4518, * 18 (S.D.N.Y. Mar. 15 2002) (same). Admission of the hearsay testimony for the limited purpose for which it was received was not in error.

### 2. Testimony of ESS's female employees

ESS objects to the admission of testimony by three former ESS female employees. ESS argues that this testimony, about Gaby Sutton's malfeasance around the office, was repetitive, and cumulative as well as irrelevant and prejudicial. The argument that the relatively brief testimony by three witnesses was cumulative is absurd given the length of the trial testimony as a whole. Also, the women testified to different incidents, had different views from one another and Watson as to the

48

appropriateness of various actions by Gaby Sutton and as to whether ESS had adequately dealt with those behaviors, and (contrary to ESS's suggestion, Defense Brief at 36) the women's testimony did not amount to the repetition of sexual comments over and over again.  Tr. 190, 619-39, 711-21.  This testimony simply did not rise to the level of being unduly cumulative.  See, e.g., Leopold v. Baccarat, Inc., 174 F.3d 261, 269-270 (2d Cir. 1999) (affirming district court admission of testimony as to offensive comments made by party as neither cumulative nor unduly prejudicial).

Defendant asserts that because Watson does not make a claim of hostile work environment or sexual harassment, that the women's testimony was irrelevant.  However, as the Court ruled before trial, it was necessary for the jury "to decide whether the company's nondiscriminatory explanation for terminating Miss Watson is mere pretext."  Thus, "the credibility of the decision makers at the company" and of Watson was very much at issue.  "This evidence is highly relevant to the company's credibility on the issue of how seriously the company takes complaints of sexual harassment and how seriously it took Miss Watson's complaint and how it otherwise responded to such complaints."  Tr. 12 (Apr. 19).  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993) (disbelief of defendant's proffered reasons for employment action probative of ultimate fact of intentional discrimination);

accord <u>Fisher v. Vassar College</u>, 114 F.3d 1332, 1338 (2d Cir.1997) (<u>in banc</u>).

Furthermore, the evidence was not unduly prejudicial. As ESS itself admits, none of the women alleged that they had been sexually harassed, and some of the testimony by these women actually bolstered ESS's claims. Defense Brief 35-36. Admission of the testimony was thus appropriate under a Rule 403 balancing analysis.

### 3. The EEOC file

ESS objects to admission of the EEOC Determination, the EEOC right to sue letter, the two affidavits, a letter by Albert Sutton to the EEOC, and a letter by ESS's counsel to the EEOC. Plaintiff's Exhibits 10, 11, 4, 5, 6, and 8. ESS contends that the EEOC determination and right to sue letter were not sufficiently reliable under Fed. R. Evid. 803(8)(C) and were less probative than prejudicial under Fed. R. Evid. 403. Generally, EEOC determinations are sufficiently reliable to be admissible under the public records hearsay exception of Fed. R. Evid. 803(8)(C), though whether to admit such a determination is subject to this Court's discretion. <u>See</u> <u>Paolitto v. John Brown E. & C., Inc.</u>, 151 F.3d 60, 64-65 (2d Cir. 1998). Here, the report was well substantiated by the evidence at trial, and bore sufficient indicia of reliability to be admissible under Fed. R.

Evid. 803(8)(C).[14]  And although the EEOC determinations rested

on material that was not admitted at trial (such as the taped

conversations in which Watson's coworkers admitted the falsity of

their affidavits), the final determinations based on this

information were nonetheless admissible under this exception.

Also, the evidence admitted was not unduly prejudicial.

First, the vast majority of the information contained in the EEOC

documents that was contrary to ESS's position was confirmed by

testimony at trial (to which ESS did not object, see Tr. 246)--

such as the falsity of the affidavits.  And this information was

relevant to the veracity of ESS's proffered grounds for

terminating Watson, for the same reasons discussed above.   The

only possibly objectionable information contained in the EEOC

determination was reference to another ESS employee who was

allegedly fired in retaliation for complaining about Gaby

Sutton's behavior.  Plaintiff's Exhibit 10 at 2.  However, ESS

did not object to the inclusion of this information in Watson's

opening statement, Tr. 19 (Apr. 20).  And in its brief in support

of a new trial, ESS relies on this evidence (and Watson's failure

---

[14]ESS's reliance on <u>McClure v. Mexia Indep. Sch. Dist.</u>, 740
F.2d 396 (5th Cir. 1985) is misplaced.  First, the Second Circuit
has observed that the Fifth Circuit's jurisprudence on the
admissibility of EEOC determinations is contrary to this
Circuit's and is indeed the minority view.  <u>Paolitto</u>, 151 F.3d at
64 & n.3.  Additionally, the language cited by ESS is dicta, and
<u>McClure</u> affirms the district court's admission of the EEOC file
in its entirety.  <u>McClure</u>, 740 F.2d at 403.

to produce this witness) as bolstering ESS's case.  Defense Brief at 16.  ESS cannot first complain of this error in its Reply brief (at 16).  The objection to the inclusion of this portion of the EEOC record has been effectively waived.  However, even if it were not, the inclusion of this information--which was (in this Court's first hand view of trial) likely lost in the sea of other facts before the jury, and far overwhelmed by the testimonial evidence from both sides--was harmless.

ESS was permitted to challenge the validity of the EEOC determination and attempt to impeach the credibility of that evidence.  Tr. 389.  Also, the jury was appropriately instructed as to the limited purpose of these materials.  Court's Exhibit 8 at 19.  The admission of the EEOC information was within this Court's discretion; viewed in the context of the trial as a whole, the Court is confident that the file's admission does not warrant a new trial.


### 4.  Watson's Website

ESS asserts that the Court should not have excluded pictures from Watson's website.  However, the Court is confident that the pictures were of negligible probative value.  Watson's website had numerous and varied pictures on it--primarily portraits of small children, pictures of families, some wedding pictures, pictures of war veterans in their uniforms, and so forth.  <u>See</u>

Court's Exhibit 2. Included among these photographs are artistically done photographs of a nude pregnant woman, clearly near the end of her pregnancy. The website also displays a series of photographs of nude and partially clothed body builders and individuals with elaborate tattoos.

ESS argues these photographs should have been admitted because "one of the key issues in this case. . . was plaintiff's subjective belief as to whether a comment she heard about the contents of a magazine known for pictures of naked women likely had such a severe impact on her" that she would have deemed it harassment. Defense Brief at 37. ESS misstates the issue, and mischaracterizes what was offensive about Gaby Sutton's behavior. Gaby's statement to Watson had nothing to do with nudity, or nude women; rather he specifically and explicitly asked Watson whether she engaged in a particular sexual practice most would view as demeaning and then stated that he thought she probably did. Whether or not Watson is offended by naked pictures is hardly relevant to whether she felt harassed by Gaby's comment.

Additionally, the photographs on the website are far from prurient or pornographic (thus further diminishing their relevance to what sort of sexual material Watson would consider harassing). Nonetheless, there was the chance that the photographs might be prejudicial. The Court ruled that some people "may view as shocking, a very pregnant woman probably

about nine months pregnant viewed nude from the side." Given the lack of relevance and the potential for prejudice, the photographs were properly excluded.

Moreover, at trial, ESS's counsel withdrew his motion in limine to have the website admitted, because the parties reached an agreement as to the admission of certain parts of the website. See Tr. 565-68. Thus, any objection to the exclusion of the website, in addition to being without merit, was waived. See Defendant's Exhibit AA (photos entered on consent of parties).

### 5. Plaintiff's claim of sexual harassment against a prior employer

The Court agrees with ESS that testimony about prior charges by Watson of sexual harassment were relevant to her credibility. See Tr. 857. Watson did testify at trial that she did not previously file a charge of harassment against any of her prior employers. Tr. 467. ESS, near the end of trial, attempted for the first time to offer impeachment evidence that she had in fact filed a claim against a prior employer with the New York State Division of Human Rights (which she never pursued). Court's Exhibit 4. However, the proffered evidence was not listed on the pre-trial order, and the Court was concerned that late revelation of the evidence would prejudice Watson. Tr. 854-55. In fact, ESS did not obtain the evidence until the day of the rebuttal case (and this was not the only evidence ESS claimed to discover

only during trial).  Tr. 861.

ESS was on notice as early as Watson's deposition that an
attorney representing Watson had sent a letter to her prior
employer regarding alleged sexual harassment.  Tr. 862.  ESS was
free to investigate the possible claim, and could have obtained
the relevant record earlier.  Given Watson's honesty generally
and her forthrightness (and almost complete accuracy of recall)
at her deposition as to the prior matter, the Court does not
believe that Watson's testimony that she had not filed a charge
was deliberately false; had the document been produced earlier,
Watson's recollection of precisely what had happened could have
been refreshed and the relevant testimony may have been
different.

ESS had ample opportunity and notice to pursue this evidence
and produce it prior to trial, but failed to do so.  ESS offered
no good excuse as to the late date of discovery.  All lawyers in
this trial had some trouble following the appropriate rules of
procedure for federal court, and it fell to the court to attempt
to impose some modicum of order.  The purpose of a pretrial order
is "to insure the efficient resolution of cases and, most
importantly, minimize prejudicial surprise." Lamborn v. Dittmer,
873 F.2d 522, 527 (2d Cir. 1989).  "[M]odification should not be
allowed that would seriously prejudice one of the parties."
McFadden v. Sanchez, 710 F.2d 907, 911 (2d Cir. 1983) (internal

citation omitted).  It was well within this Court's discretion to refuse to admit the evidence of the prior claim in the interest of justice.  See <u>Bradford Trust Co. v. Merrill Lynch Pierce, Fenner, and Smith, Inc.</u>, 805 F.2d 49, 52 (2d Cir. 1986).

### 6.  Plaintiff's counsel's closing argument

ESS contends that a new trial is required because of alleged improprieties in Watson's counsel's closing argument.  However, ESS failed to make any contemporaneous objection to that closing argument, and thus must overcome a high burden in order to obtain a new trial.  <u>Greenway v. Buffalo Hilton Hotel</u>, 143 F.3d 47, 51 (2d Cir. 1998).  The majority of ESS's objections are frivolous, and none warrants a new trial.  ESS argues that Watson's counsel focused not on the letter Watson sent or her termination, but on all of the surrounding circumstances.  This focus was completely proper--the letter and termination were not in dispute--it is the parties' motivations and beliefs that were in dispute.

Any mis-characterizations by Watson's counsel were harmless given the clear jury instructions and the overall weight of the evidence at trial.  The Court is satisfied that any errors did not affect the fundamental integrity of the trial.  <u>Pappas v. Middle Earth Condo Ass'n</u>, 963 F.2d 534, 541 (2d Cir. 1992).

## V. Conclusion

The Court has considered all of ESS's arguments, and concludes that those relating to the jury's finding of liability and purported errors at trial are without merit. ESS's motion for a new trial as to liability therefore is denied. However, because the punitive and emotional distress damages are excessive, the Court concludes that they must be vacated.

Therefore, it is hereby

ORDERED, that the Plaintiff may file with the Clerk of the Court on or before September 30, 2005, an acceptance of the remittitur of emotional damages from $500,000 to $120,000 and of punitive damages from $2.5 million dollars to $717,000 (with no change in the compensatory damages for front or back pay). In the event that the Plaintiff does not file an acceptance of the remittitur on or before September 30, 2005, a new trial solely on the issue of emotional and punitive damages will commence on a date to be set by the Court.

SO ORDERED

DATED:     New York, New York

September **6**, 2005

Kimba M. Wood
United States District Judge

57